

**FILED**

MAY 1 8 2015

Clerk, U.S. District Court
District Of Montana
Missoula

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| CONFEDERATED SALISH AND KOOTENAI TRIBES,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF INTERIOR SECRETARY SARAH "SALLY" JEWELL; UNITED STATES BUREAU OF INDIAN AFFAIRS; JOCKO VALLEY IRRIGATION DISTRICT; MISSION IRRIGATION DISTRICT; FLATHEAD IRRIGATION DISTRICT; DISTRICT COURT FOR THE TWENTIETH JUDICIAL DISTRICT OF MONTANA PRESIDING JUDGE HON. JAMES E. MANLEY; MONTANA WATER COURT CHIEF JUDGE RUSSELL McELYEA and ASSOCIATE WATER JUDGE DOUGLAS RITTER; BLANCHE CREPEAU; ALEX CREPEAU; JUDY HARMS; ROBERT HARMS; BETTY A. STICKEL; WAYNE D. STICKEL; and AN UNKNOWN NUMBER OF JOHN DOE DEFENDANTS CLAIMING FIIP IRRIGATION WATER AS A PERSONAL WATER RIGHT,<br><br>Defendants. | CV 14–44–M–DLC<br><br>ORDER |

-1-

and

MONTANA ATTORNEY GENERAL,

Defendant-Intervenor.

Before the Court are the following ripe motions: (1) motion to dismiss for lack of subject matter jurisdiction, filed by Defendants Hon. James E. Manley, Hon. Russell McElyea, and Hon. Douglas Ritter ("Montana Judges"); (2) motion to dismiss for lack of subject matter jurisdiction, filed by Defendants Judy Harms, Robert Harms, Betty A. Stickel, and Wayne D. Stickel ("Harms and Stickels"); (3) motion to dismiss for lack of subject matter jurisdiction, filed by Defendant-Intervenor Montana Attorney General ("Attorney General"); (4) motion for extension of time to file an answer, filed by Defendants Jewell and United States Bureau of Indian Affairs ("Federal Defendants"); and (5) Federal Defendants' motion to stay.  For the reasons explained below, the Court grants the motions to dismiss and denies Federal Defendants' procedural motions as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

For purposes of Defendants' motions to dismiss, "[a]ll factual allegations set forth in the [C]omplaint are taken as true and construed in the light most favorable to [Plaintiff]." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir.

-2-

2001).

In 1855, the United States and what became known as the Confederated Salish and Kootenai Tribes ("Tribes") entered the Hellgate Treaty ("Treaty") creating the Flathead Indian Reservation ("FIR"). Prior to the Treaty, the Tribes transiently occupied much of present-day Montana, and engaged in the typical activities of tribal life throughout the region. The Treaty itself resulted in, among other things, cession of tribal lands west of the Continental Divide to the United States, reservation of the land currently comprising the FIR for the exclusive use and benefit of the Tribes, and reservation of an "exclusive right of taking fish in all the streams running through or bordering" the FIR and "at all usual and accustomed places." (Doc. 27 at 10 (citations omitted).)

Between 1855 and 1904, tribal members engaged in traditional hunting and fishing practices within the boundaries of the FIR, but also began to engage in more formal agricultural practices, including construction of irrigation ditches and water delivery systems. Then, in 1904, the United States Congress enacted the Flathead Allotment Act, which generally permitted non-Indian entry into the FIR and created the Flathead Indian Irrigation Project ("FIIP"). Congress amended the Flathead Allotment Act in 1908 to provide for physical expansion of the FIIP and create a system for non-Indians to obtain a water right. The 1908 amendment also

included provisions requiring non-Indians to pay the costs of construction of the FIIP, in amounts proportional to the acreage individual non-Indians intended to irrigate.  The amendment contemplated transfer of management and operation of the FIIP to the owners of the land irrigated by the system *after* all costs had been paid.

By 1926, only a small percentage of the cost of the FIIP had been paid by non-Indian landowners utilizing the system.  In that year, Congress passed legislation requiring landowners to form irrigation districts for the purpose of entering into repayment contracts with the Secretary of the Interior.  The contracts provided a fifty-year repayment term, and specified that a portion of FIR hydroelectric revenues were to be used to pay for the FIIP.  Twenty-two years later, after a series of contract amendments failed to catalyze full reimbursement, Congress passed further legislation adjusting the payment terms and superseding all previous contracts.  Ultimately, the irrigation districts – defendants in this case – have not repaid the federal government for the costs of the FIIP.  Moreover, "[t]he repayment contracts did not change or divest the [Bureau of Indian Affairs] of title to [the] FIIP then or prospectively nor did they divest the [Bureau of Indian Affairs] of its federal duty to operate and maintain the FIIP."  (Doc. 27 at 32.)

Following the Montana Legislature's passage of the Water Use Act,

-4-

Montana Code Annotated § 85-2-101 et seq., in 1976, the Bureau of Indian Affairs filed a water rights claim in its own name for water necessary to serve the FIIP, and also filed a claim, listing the Tribes as co-owner, for all waters associated with the FIR. The Tribes also filed a water rights claim in their own name for all waters associated with the FIR. Adjudication of those claims has been statutorily suspended since the 1980's due to ongoing negotiations between the Tribes and the Montana Reserved Water Rights Compact Commission. The statutory suspension expired on July 1, 2013 and, notwithstanding passage of a negotiated compact, the Tribes must file water rights claims with the Montana Department of Natural Resources Conservation by June 30, 2015.[1]

The Tribes filed this action on February 27, 2014, and filed their First Amended Complaint ("Amended Complaint") on May 15, 2014. The Tribes seek a declaration that: (1) all waters on, under, and flowing through the FIR were reserved for the Tribes by the Hellgate Treaty; (2) the lands comprising the FIR were never a part of the public domain; (3) for purposes of Montana's prior appropriation scheme, the Tribes' aboriginal water rights carry a priority date of time immemorial and their consumptive rights carry a priority date of July 16,

---

1. The CSKT Water Compact passed the Montana Legislature in April 2015, and was signed into law by Montana Governor Steve Bullock on April 24, 2015. The Court takes judicial notice of these facts pursuant to Rule 201(b) of the Federal Rules of Evidence.

1855; (4) no individual has successfully acquired a right to the Tribes' reserved water; (5) the water serving the FIIP comes out of the Tribes' 1855 right, and carries a priority date of April 23, 1904; and (6) the FIIP has always been administered by the Bureau of Indian Affairs.

The Tribes also seek injunctive relief as to several cases pending before the Montana Judges in their respective courts, which the Tribes allege implicate their federal reserved water rights.  First, the Tribes seek an order enjoining Judge Manley of the 20th Judicial District Court of Montana "from taking any action to determine who owns water rights, or claims to water rights made available through any FIIP irrigation facility, structure, reservoir[,] ditch or other means" in two cases filed in that court.  (Doc. 27 at 44.)  The Tribes allege that the state court "is proceeding with a trial on the question of ownership of water rights on the federal FIIP in the middle of the Tribes' [FIR]."  (*Id.* at 40.)  Second, the Tribes seek an order enjoining Judges McElyea and Ritter of the Montana Water Court from exercising jurisdiction over a case involving some of the same parties and questions of water ownership raised in the cases before Judge Manley.  Plaintiffs' and the Montana Judges agree that the Montana Water Court case, *In Re Adjudication of Existing and Reserved Water Rights to the Use of Water, Both Surface ad Underground, of the Federal Flathead Indian Reservation, Basin 76L,*

-6-

Case No. WC-2013-05, has been dismissed.

Defendants filed the instant motions to dismiss in mid-2014.  In response to a request from the Court, the parties also filed status reports addressing the impact upon this case, if any, of adoption of the CSKT Compact by the Montana Legislature.  Ultimately, the Montana Legislature's action on the CSKT Compact is but one step in a longer process and does not moot the Tribes' claims, although it certainly may alter the status and posture of the state court proceedings.

## LEGAL STANDARDS

Either by motion or on its own, a court should dismiss an action for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure if it determines it does not have "power to hear the case." *Morrison v. Natl. Australia Bank. Ltd.*, 130 S.Ct. 2869, 2877 (2010) (citations omitted). Where the attack on a plaintiff's jurisdictional averments is "facial," i.e. the movant "accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction," a district court reviews the motion as it would a motion to dismiss for failure to state a claim. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citations and internal quotation marks omitted).

In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a

claim, a complaint must "contain sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). Courts generally limit their considerations under this standard to the

allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-559

(2007). Those allegations are accepted as true and viewed in a light most

favorable to the plaintiff. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th

Cir. 2008).

ANALYSIS

The Montana Judges, Harms and Stickels, and Attorney General urge the

Court to dismiss the Tribes' case based on combinations of the following theories:

(1) immunity, (2) abstention, (3) lack of a case or controversy under Article III of

the United States Constitution, (4) ripeness, or (5) the Tribes' simple failure to

state a claim. The Court finds that the claim for injunctive relief is barred by

absolute judicial immunity, and declines to exercise its discretionary jurisdiction

over the claim for declaratory relief pursuant to the Declaratory Judgment Act, 28

U.S.C. § 2201. As a result, the Court will not address Defendants' other bases for

dismissal.

**I.     Judicial Immunity.**

The Montana Judges filed their motion to dismiss the Tribes' original

-8-

Complaint, which named only the respective courts and not the individual judges. Consequently, the Montana Judges assert that the Tribes' claims against them, as state institutions, are barred by the Eleventh Amendment to the United States Constitution.  In a footnote in their opening brief and again in their reply brief, the Montana Judges alternatively contend that they are immune from suit on judicial immunity grounds.  The Tribes counter that their claims satisfy the exception to the Eleventh Amendment bar contoured in *Ex Parte Young*, 209 U.S. 123, 167 (1908), and thus may proceed.  As to judicial immunity, the Tribes claim that both a Montana state statute and a past decision of this Court provide that judicial immunity extends only to suits for damages, not to a suit in equity as is present here.  Because the Court finds that the claims against Judges McElyea and Ritter are moot and that Judge Manley is judicially immune from suit, the Court need not broach the issue of sovereign immunity under the Eleventh Amendment.

As an initial matter, dismissal of the Water Court case cited in the Tribes' Amended Complaint renders the claim for injunctive relief against Judges McElyea and Ritter moot.  This is not a case of voluntary conduct "capable of repetition, yet evading review." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see Wolfson v. Brammer*, 616 F.3d 1045, 1053-1054 (9th Cir. 2010) (the "'capable of repetition, yet evading review' . . .

exception permits actions for prospective relief to go forward despite abatement of the underlying injury only in exceptional situations where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again") (citations omitted). Rather, the only way Judges McElyea and Ritter could again conduct an allegedly unlawful adjudication implicating the Tribes' water rights is if a claimant filed another claim to FIR water in the Water Court. Even then, there is no guarantee that the Tribes would *not* be joined in that action, and thus no guarantee that a subsequent assumption of jurisdiction would violate the McCarran Amendment, 43 U.S.C. § 666. Furthermore, the very nature of publicly-filed water rights claims means that a subsequent Water Court case implicating the Tribes' rights is unlikely to evade review. Judges McElyea and Ritter are no longer viable defendants in this case, and so are dismissed on mootness grounds. The Court then turns to Judge Manley, and dismisses him from this case on immunity grounds.

Judicial immunity is immunity from suit altogether, not merely immunity from liability. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). "A judge will not be deprived of immunity because the action he took was in error, was done

maliciously, or was in excess of his authority." *Stump v. Sparkman*, 435 U.S. 349, 356-357 (1978); *see Schucker v. Rockwood*, 846 F.2d 1202, 1204 (9th Cir. 1988) (per curiam) (citations omitted).

There are two recognized exceptions to the general rule of judicial immunity. First, a judge is not protected as to her non-judicial actions. *Mireles*, 502 U.S. at 11 (citing *Forrester v. White*, 484 U.S. 219, 227-229 (1988)). "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362.

Second, a judge is "subject to liability . . . when he has acted in the clear absence of all jurisdiction." *Id.* at 356. For example, "if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune." *Id.* at 356 n.7 (citing *Bradley v. Fisher*, 80 U.S. 335, 352 (1908)). "[T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Id.* at 356.

Judicial immunity precludes the Tribes' injunctive relief claims against Judge Manley. As to the nature of his acts, it cannot be said that Judge Manley's assumption of jurisdiction over the two cases at issue in the Tribes' Amended Complaint constitutes a non-judicial act. Obviously, presiding over cases filed in a judicial district is a function normally performed by judges of that district, and nothing in the Amended Complaint indicates that Judge Manley interacted with the parties in a manner outside his capacity as judge.

As to whether he acted in clear absence of jurisdiction, Montana law confers upon state district courts an important role in the administration of water and the resolution of disputes concerning it. *See e.g.* Mont. Code Ann. §§ 85-2-214(1) (an "action [for adjudication of a water rights claim] is considered filed in the judicial district of the county in which the diversion is made"), 85-2-406(1) ("district courts shall supervise the distribution of water among all appropriators"). However, the task of adjudicating water rights between claimants to a particular basin or body of water falls on the Montana Water Court. *Id.* at § 85-2-216. Montana law clearly vests state district court judges with jurisdiction and power over water disputes, albeit short of adjudication. As it relates to the rights of the Tribes, both Judge Manley and the Montana Water Court will be constrained by federal law, a fact repeatedly conceded by these Defendants in their motion to

-12-

dismiss.  Consequently, neither this exception nor the non-judicial acts exception to judicial immunity apply.

The Montana Judges and the Tribes disagree as to whether judicial immunity applies to actions seeking injunctive relief.  The Tribes cite to Montana Code Annotated § 2-9-112 for the proposition that state law judicial immunity protects judicial officers only against suits for damages.  While the text of the statute certainly confirms the point, given that the Court's jurisdiction in this action is based upon a federal question, there is no basis for importing this state substantive law.  The state statute does not define the extent of the Montana Judges' immunity in federal court.

The Tribes further cite this Court's decision in *Leachman v. Hernandez*, 2011 WL 2559837 * 3 (D. Mont. June 28, 2011), in support of the availability of injunctive relief despite judicial immunity.  In *Leachman*, the Court cited the United States Supreme Court's holding in *Pulliam v. Allen*, 466 U.S. 522, 541-542 (1984), providing that judicial immunity, as a form of absolute immunity, does not bar claims for injunctive relief.  However, *Pulliam* involved a civil rights claim under 42 U.S.C. § 1983, and the Court's rationale – that barring injunctive relief against a state court judge would undercut the purpose of the Civil Rights Act – appears uniquely applicable to § 1983 claims.  Indeed, a number of Ninth Circuit

-13-

and district court decisions after *Pulliam* limit the exception to judicial immunity

for equitable claims to suits under § 1983.  *See e.g. Ashelman v. Pope*, 793 F.2d

1072, 1075 (9th Cir. 1986); *Mullis v. Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385,

1391-1394 (9th Cir. 1987) (finding that "[i]t is now established that judicial

immunity does not bar declaratory or injunctive relief in actions under § 1983,"

but does bar such relief in *Bivens* actions); *Eggar v. City of Livingston*, 40 F.3d

312, 317 (9th Cir. 1994); *Brewster v. Wingate*, 2014 WL 3866173 *1 (N.D. Cal.

Aug. 6, 2014) (the "judicial immunity available to state judges sued under § 1983"

does not "extend[] to actions for declaratory, injunctive and other equitable relief")

(emphasis added).  Moreover, the fact that Congress amended § 1983 in 1996 to

limit the instances in which a judicial officer may be enjoined further speaks to the

narrowness of the exception to the rule of judicial immunity.[2]  *See Alvarez Acuna*

*v. Fireside Thrift Co., Inc.*, 2006 WL 1312528 * 4-5 (D. Ariz. May 11, 2006)

(noting the effect of the amendment to § 1983 and concluding that "if a defendant

can successfully assert judicial immunity from damages, that immunity will also

bar declaratory and injunctive relief").  Ultimately, nothing in *Pulliam* or any of

the cases construing it suggest that, across the board, state court judges lack

---

2. 42 U.S.C. § 1983 now provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

immunity from suits claiming injunctive relief.  As the Tribes' suit does not include a § 1983 claim, judicial immunity remains available to Judge Manley as a bar to this action.

Based on the foregoing, the Court grants the Montana Judges' motion to dismiss on judicial immunity grounds and dismisses Count II of the Tribes' Amended Complaint.

## II.   Court Discretion Under the Declaratory Judgment Act.

The Attorney General moves to dismiss the Tribes's claim for declaratory relief, urging the Court to exercise the discretion vested in it by the Declaratory Judgment Act, 28 U.S.C. § 2201, and decline jurisdiction.  The Tribes' declaratory claim, by which they purport to seek a "ruling only on the ownership of FIIP water" (Doc. 63 at 11 n.3.), actually contains eleven separate elements.  The Tribes ask the Court to "reaffirm[] and declar[e] that:"

1.   the Hellgate Treaty did not implicitly diminish aboriginal water rights;

2.   when the FIR was created the United States reserved all waters on, under and flowing through the Reservation for the Tribes;

3.   the chain of title to land on the FIR has never been broken and for that reason no lands within the borders of the FIR have ever been part of the public domain or subject to general public land

-15-

laws;

4.   after the FIR was created the Tribes continued their exclusive and uninterrupted use and occupation of Reservation lands and waters for hunting, fishing and gathering practices.  Tribal water rights for nonconsumptive aboriginal uses carry a priority date of "time immemorial."

5.   all waters of the FIR for consumptive use were reserved by the Tribes pursuant to the *Winters* Doctrine.  The priority date for Tribal and individual Indian consumptive water use is July 16, 1855;

6.   water rights on the Flathead Indian Reservation could only be acquired as specified by Congress;

7.   Congress specified the only manner for any non-Indian to acquire a water right on the FIIP in the Acts of 1908, 1912, 1914 and 1926, addressed above, and that those conditions have not been met by any person;

8.   the [Secretary of the Interior] has issued no person a "final certificate of water right" under the FAA;

9.   the 1904 [Flathead Allotment Act] implicitly reserved to the United States out of the senior pervasive Tribal *Winters* rights a volume of irrigation water to serve the federal purpose of the FIIP, with a priority date of April 23, 1904;

10.   as a matter of federal law the [Bureau of Indian Affairs] is entitled to a volume of irrigation water adequate to maintain beneficial irrigation in the FIIP service area when such volumes of irrigation

-16-

> water are physically available within the FIR and
> do not adversely impact the Tribes' "time
> immemorial" instream flow rights; and
>
> 11.    FIIP has always been a [Bureau of Indian Affairs]
>        Indian irrigation project and not a Bureau of
>        Reclamation irrigation project.

(Doc. 27 at 42-44.) The Tribes' stated purpose in seeking these declarations is "to frame the federal law under which water for irrigation on the FIR will be adjudicated and quantified in a proper general *inter sese* water rights adjudication under the Montana Water Use Act that satisfies the McCarran Amendment, 43 U.S.C. § 666." (*Id.* at 8.) Based on the breadth of the requested relief and the Tribes' intentions in seeking it, the Court agrees with the Attorney General and declines jurisdiction over the declaratory judgment claim.

The Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The statute "has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," as opposed to conferring "an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). "In the declaratory judgment

-17-

context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. "The Declaratory Judgment Act embraces both constitutional and prudential concerns," meaning even if constitutional standing and statutory jurisdictional requirements are met, "the district court must also be satisfied that entertaining the action is appropriate." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222-1223 (9th Cir. 1998) (en banc).

The Court's discretion in deciding whether to assume jurisdiction of a declaratory judgment action is not without guidance. Generally, the Court "should avoid needless determination of state law issues; it should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation." *Id.* at 1225 (citing *Cont'l Cas. Co. v. Robsac Indus.*, 947 F.2d 1367, 1371 (9th Cir. 1991)); *see Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495-496 (1942). The so-called "*Brillhart* factors" are not necessarily the end of the inquiry – the Court may also consider "whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in

-18-

entanglement between the federal and state court systems." *Dizol*, 133 F.3d at 1225 n.5 (citations omitted).  Moreover, while the Court should not decline jurisdiction over a declaratory claim when other claims are joined with it, the Court "should generally decline to entertain reactive declaratory actions." *Id*.

Even prior to engaging in a *Brillhart* and *Dizol* analysis, the Court is skeptical that a case or controversy exists here.  The Declaratory Judgment Act's standing requirement is met when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citations omitted).  In their declaratory action, the Tribes essentially seek from this Court a written distillation of the federal law applicable to their FIR water rights claims.  (Doc. 27 at 8.)  The Tribes allege in the injunctive claim that Judge Manley's assumption of jurisdiction violates the McCarran Amendment, but do not, according to their declaratory claim, intend to leverage this Court's ostensible declaration in the 20th Judicial District.  As between the Tribes and the remaining defendants, any alleged confusion over the import of federal tribal water law does not itself give rise to legal adversity.  The proper place and time for exposition of the contentions and points of law listed in the Tribes' declaratory

-19-

prayer for relief is in the future adjudicatory proceeding in the Montana Water Court, not now in this federal forum. In sum, by seeking what amounts to an advisory declaration, the Tribes fail to raise an actual case or controversy amenable to declaratory judgment.

The *Brillhart* and *Dizol* factors further support the Court declining jurisdiction over the declaratory claim. If the CSKT Compact proceeds through the tribal government and Congress, the document will ultimately land in the hands of the Montana Water Court for incorporation into a decree governing the basins and water bodies comprising the FIIP. Under this circumstance, a declaration of the kind the Tribes request would serve no purpose – the CSKT Compact resolves tribal priority to the water at issue. Thus, if all goes as planned by the parties to the CSKT Compact, the Tribes' declaratory claim would be a needless determination of, and entanglement with, what would be a state law issue. On the other hand, if Congress and the tribal government fail to ratify the document, the Tribes will participate as other water rights claim holders do in typical stream adjudications before the Montana Water Court. Under this circumstance, a declaration of the kind the Tribes request would result in duplicative litigation and would encourage forum shopping – the Tribes would likely make the same historical and legal arguments made before this Court if they

were to appear before the Montana Water Court without a decree, and they seek a declaration now on the off chance the Montana Water Court gets the law wrong. *Brillhart* counsels against taking jurisdiction of the declaratory claim.

Furthermore, a declaration by this Court certainly will not settle all aspects of the adjudication and quantification of water on the FIR, given that Montana law mandates additional process in the Montana Water Court. The Tribes' ask the Court to restate what it contends are settled principles and points of law. If that is the case, then no order of the Court will necessarily afford those principles greater weight in proceedings before the Montana Water Court. Likewise, there is no reason to think that the Montana Water Court will get the law wrong to the extent this Court needs to intervene and issue advisory opinions.

Judge Manley and the Montana Water Court are duty-bound to follow federal law, which in this case appears well established, and this Court has no reason to believe they will fail to do so.

Based on the foregoing, the Court grants the Attorney General's motion to dismiss on discretionary grounds pursuant to the Declaratory Judgment Act, and dismisses Count I of the Tribes' Amended Complaint.

Accordingly, IT IS ORDERED that:

(1)     Defendants Montana Judges' motion to dismiss (Doc. 28) is

-21-

GRANTED.

(2)    Defendants Harms' and Stickels' motion to dismiss (Doc. 55) is

GRANTED.

(3)    Defendant-Intervenor Montana Attorney General's motion to dismiss

(Doc. 59) is GRANTED.

(4)    Federal Defendants' motion for extension of time to file an answer

(Doc. 102) is DENIED AS MOOT.

(5)    Federal Defendants' motion to stay (Doc. 103) is DENIED AS

MOOT.

(6)    This case is CLOSED.

DATED this 18th day of May, 2015.

Dana L. Christensen, Chief Judge
United States District Court